Terry Gross (SBN 103878)
Adam C. Belsky (SBN 147800)
GROSS & BELSKY P.C.
201 Spear Street, Suite 1100
San Francisco, CA 94105
Tel: (415) 544-0200
Fax: (415) 544-0201
terry@grossbelsky.com
adam@grossbelsky.com

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| RITUAL COFFEE ROASTERS, INC., on behalf of itself and all others similarly situated,<br><br>            Plaintiff,<br><br>   v.<br><br>SK ENERGY AMERICAS, INC.; SK TRADING INTERNATIONAL CO. LTD.; VITOL INC.; DAVID NIEMANN; and BRAD LUCAS<br><br>        Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT: (1) THE SHERMAN AND CLAYTON ACTS (15 U.S.C. §§ 1, 26); (2) THE CARTWRIGHT ACT (CAL. BUS. & PROF. CODE §16720); (3) UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200 ET SEQ.); AND (4) UNJUST ENRICHMENT DEMAND FOR JURY TRIAL** |

Capitalizing on a disastrous explosion that rocked a large gasoline refinery complex in Torrance, California and the resulting supply disruption it caused, Defendants engaged in a number collusive and coordinated schemes to unlawfully increase gasoline prices paid by businesses and consumers in California. Defendants effectuated the conspiracy by, *inter alia*, manipulating trades and selectively reporting trades to certain benchmarking services, causing the market prices of Regular and Premium gasoline in California to increase to levels that would not have existed in a competitive market. California businesses and consumer have suffered substantial economic harm as a result of Defendants' conduct. As alleged herein, the conduct was hidden, tolling any statute of limitations, as set forth below.

## I.    INTRODUCTION

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1337(a) and 1367. This Court has *in personam* jurisdiction over Defendants because each, directly and/or through its ownership or control of subsidiaries: (a) transacted business in the United States, including in this District; (b) are registered to do business in the state of California; (c) had substantial aggregate contacts with the United States, including this District; and/or (d) engaged in anticompetitive acts that were directed at, and had a direct, substantial, and reasonably foreseeable and intended effect of injuring, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

2.    Plaintiff on behalf of itself and all others similarly situated, brings this Class Action Complaint for damages, restitution, and injunctive relief against Defendants Vitol Inc. ("Vitol"), SK Energy Americas, Inc. ("SK Energy"), and SK Trading International Co. Ltd. ("SK Trading") (Defendants SK Energy and SK Trading are hereinafter referred to as "SK") (collectively "Defendants") for violations of Section 1 of the Sherman Act

(15 U.S.C. § 1), California's Cartwright Act, California Business and Professions Code section 16720 et seq., engaging in unlawful, unfair, or fraudulent practices in violation of California's Unfair Competition Law, California Business and Professions Code section 17200 et seq., and unjust enrichment.

3.    This action is brought against Defendants for entering into a *per se* unlawful agreement to restrain competition in the spot market for gasoline formulated for sale in California and for particular gasoline blending components used therein.

4.    At all relevant times in this Complaint, Defendants participated in the spot market for refined gasoline and gasoline blending components located in California.

5.    Defendants' unlawful behavior began in 2014 and at least as early as February 2015 after an explosion at a large gasoline refinery complex in Torrance, California that supplied roughly ten percent of all gasoline in the state and twenty percent of all gasoline in Southern California. A key part of the refinery complex was severely damaged, resulting in an unanticipated undersupply of refined gasoline in California and eliminating the refinery's ability to refine alkylates blended with the gasoline. Defendant's unlawful conduct continued through late 2016.

6.    Consequently, prices for gasoline contracts rose on the California spot markets and prices at gasoline pumps soon followed. Thus, beginning in February 2015, California motorists saw unprecedented increases in gasoline prices.

7.    These events presented Defendants with an opportunity to artificially inflate the price of gasoline traded on wholesale spot markets in California and increase the price of alkylates, whose prices are tied directly to the wholesale price of gasoline, while avoiding scrutiny by other market participants and regulators.

8.    Defendants Vitol and SK began negotiating large contracts to supply gasoline and gasoline blending components for delivery in California, the largest of which exceeded more than ten million gallons. Additionally, Defendants Vitol and SK conspired to manipulate and raise the spot market price for gasoline to achieve greater

1   profits on these contracts.

2       9.      This scheme was primarily perpetrated by the lead traders for Defendants

3   Vitol and SK, who were friends and former colleagues. These individuals orchestrated

4   agreements with one another, as well as other third parties, to manipulate, raise, fix,

5   and tamper with the spot market price of gasoline in California using a variety of

6   different tactics. Furthermore, these actors entered into agreements to share profits and

7   shroud the existence of their scheme.

8       10.     As a result of this unlawful behavior, Defendants were unjustly enriched,

9   violated  Section 1 of the Sherman Act (15 U.S.C. § 1), California's Cartwright Act,

10  California Business and Professions Code section 16720 et seq., and engaged in

11  unlawful, unfair, or fraudulent practices in violation of California's Unfair

12  Competition Law, California Business and Professions Code section 17200 et seq.

13  **II.    JURISDICTION AND VENUE**

14      11.     Plaintiff brings this action under §§ 4, 12, and 16 of the Clayton Act (15

15  U.S.C. §§ 15, 22, and 26) for treble damages, injunctive relief, and reasonable

16  attorneys' fees and costs with respect to the injuries sustained by Plaintiff arising from

17  violations by Defendants of the federal antitrust laws, including Section 1 of the

18  Sherman Antitrust Act (15 U.S.C. § 1).

19      12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§

20  1331, 1337(a) and 1367 and as a result of diversity jurisdiction.

21      13.     This Court has *in personam* jurisdiction over Defendants because each,

22  directly and/or through its ownership or control of subsidiaries: (a) transacted business

23  in the United States, including in this District; (b) are registered to do business in the

24  state of California; (c) had substantial aggregate contacts with the United States,

25  including this District; and/or (d) engaged in anticompetitive acts that were directed

26  at, and had a direct, substantial, and reasonably foreseeable and intended effect of

27  injuring, the business or property of persons and entities residing in, located in, or

28  doing business throughout the United States, including in this District. Defendants

conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

14.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District or is licensed to do business in this District. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal restraint of trade throughout this District. The anticompetitive conduct alleged herein has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

15.    Plaintiff seeks assignment of this action to the Western Division of the United States District Court for the Central District of California. Assignment to this Division is appropriate given that the primary gasoline spot market serving Southern California is located in the Los Angeles area and the ExxonMobil refinery explosion that created the conditions facilitating Defendants' unlawful manipulation of that market is located in Torrance, California, which is in Los Angeles county.

## III.    THE PARTIES

### A.    Plaintiff

16.    Ritual Coffee Roasters, Inc., is a resident of the State of California and San Francisco County and is registered with the Secretary of State to do business in California.  Ritual Coffee Roasters, Inc. has been engaged in the wholesale business of sourcing, roasting and distributing gourmet coffee, and in the retail business of selling coffee. During the class period, Ritual Coffee Roasters, Inc. has purchased thousands of dollars of gasoline at retail during the Class Period for its own use and not for resale and was damaged as a result of Defendants' conduct.

//

### B.    Defendants

#### 1.    Defendant Vitol

17.    Defendant Vitol, a Delaware corporation, is registered with the California Secretary of State to conduct business in California.

18.    Vitol's trading activities have been the subject of scrutiny by government regulators both in the United States and abroad. Recently, the Federal Energy Regulatory Commission found the company's trading activity manipulated California energy markets and sued to recover $3.75 million in fines assessed against Vitol and one of its traders.[1] Additionally, French Authorities fined Vitol S.A. five million Euros after it was found to have manipulated the French southern gas trading point "Peg Sud" between June of 2013 and March of 2014.[2]

#### 2.    The SK Defendants

19.    Defendant SK Energy Americas, Inc. is a California corporation. Defendant SK Energy Americas, Inc is a wholly-owned subsidiary of SK Energy International ("SKEI"). SKEI is a Singaporean corporation. SKEI is the parent entity of Defendant SK Energy Americas, Inc and is itself a wholly-owned subsidiary of Defendant SK Trading International Co., Ltd.

20.    Defendant SK Trading International Co., Ltd. ("SKTI") is a South Korean corporation with its head office at 26 Jongno, Jongno-gu, Seoul, South Korea. Defendant SKTI is the grandparent entity of Defendant SK.EA and the parent entity of SKEI. Defendant SKTI is a sister entity to SK Energy, also located in South Korea, which operates one of the largest oil refineries in the world.

---

[1] ECF No. 1 in *Federal Energy Regulatory Comm'n v. Vitol, Inc.*, No. 2:20-cv-00040-KJM-AC (E.D. Cal. Jan. 6, 2020).

[2] UPDATE 1-French regulator fines Vitol 5 mln euros for gas market manipulation," Reuters, (Accessed May 8, 2020), https://www.reuters.com/article/vitol-france-fine-gas/update-1-french-regulator-fines-vitol-5-%2027mln-euros-for-gas-market-manipulation-idUSL8N1WP399.mln.euros-for-gas-market-manipulation-idUSL8N1WP399.

21.     The ultimate parent entity for the SK Defendants, and for SK Energy, is SK Innovation Co., Ltd., a publicly-traded South Korean company.

22.     At all times relevant to this Complaint, Defendant SK Energy Americas, Inc. was an agent and alter ego of Defendant SKTI, due to the nature and extent of control that SKTI exercised over Defendant SK Energy Americas, Inc.

23.     At all times relevant to this Complaint, there existed a unity of interest and ownership between SK Defendants such that any separateness between them had ceased to exist and SKTI controlled, dominated, managed, and operated SK Energy Americas, Inc to suit its convenience. Specifically, SKTI controlled the business and affairs of SK Energy Americas, Inc such that the distinction between the companies were mere technicalities.

24.     Additionally, at all times relevant to the Complaint, SK Energy Americas, Inc. was acting within the course and scope of its agency with the knowledge, consent, permission, authorization, and ratification, either express or implied, of SKTI in performing the acts alleged in this Complaint.

## C.     The Individual Defendants

25.     During the relevant period, Defendant David Niemann was an executive of SK Energy and was the senior trader responsible for executive trades on the U.S. West Coast, including in California.  Niemann colluded with Brad Lucas from Vitol, as more fully alleged herein.  On information and belief, David Niemann is a resident of Houston, Texas.

26.      During the relevant period, Defendant Brad Lucas was an executive of Vitol.  Lucas was the primary trader at Vitol with responsibility for trading gasoline and gasoline blending components that were delivered via pipeline within California. As alleged herein, Lucas and Niemann, along with others, colluded to increase the prices of gasoline in California.  On information and belief, Brad Lucas is a resident of Houston, Texas.

//

CLASS ACTION COMPLAINT

27.    SK, Vitol, Niemann, and Lucas are collectively referred to herein as "Defendants."

## IV.    AGENTS AND CO-CONSPIRATORS

28.    Various other individuals, partnerships, corporations, and other business entities, unknown to the Plaintiff, have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof. The Attorney General for the State of California has expressly named individual and corporate executives who were involve in the conspiracy. Plaintiff reserve the right to name some or all these persons and others as Defendants later.

29.    The acts charged in this complaint have been done by Defendants or were ordered or done by Defendants' officers, agents, employees, or representatives, while actively engaged in the management of Defendants' affairs.

30.    Whenever in this complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

31.    When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that the Plaintiff is alleging that one or more employee or agent of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family. In fact, the individual participants in the conspiratorial meetings and discussions did not distinguish among the entities within a corporate family. The individual participants entered into agreements on behalf and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached by them. Furthermore, to the extent that subsidiaries within corporate families distributed the alkylate products

discussed in this Complaint, these subsidiaries played a significant role in the alleged conspiracy because Defendants wished to ensure that the prices paid for such products would not undercut the pricing agreements reached at these various meetings. Thus, all Defendant entities within the corporate families were active, knowing participants in the alleged conspiracy.

## V.    FACTUAL ALLEGATIONS

### A.    Defendants Conspired To Illicitly Restrain Competition In The Spot Market For Gasoline

28.    Using a disastrous explosion that rocked a large gasoline refinery complex in Torrance, California and the resulting supply disruption that it caused as pretext, Defendants engaged in a number of collusive and coordinated schemes to unlawfully increase gasoline prices paid by businesses and consumers in California, which caused the market prices of retail gasoline to increase to levels that would not have existed in a truly competitive market.



The U.S. Chemical Safety Board released its report on the 2015 explosion at the Torrance refinery, which Exxon Mobil sold to New Jersey-based PBF Energy in 2016. (Christina House / For The Times)

29.     Beginning at least as early as February 2015,[3] Defendants reached agreements with one another, and other third parties, as part of a conspiracy to raise, fix, and tamper with the price of finished gasoline in California by using various tactics. Despite their cooperation, coordination, and collusion, SK and Vitol were supposed to be competitors (not collaborators) in the California gasoline market.

30.     Defendants were not mere market participants. Instead, they engaged in collusive conduct that drove up prices for spot market gasoline contracts delivered to major population centers like Los Angeles and San Francisco. Significantly, this caused subsequent gasoline purchasers to pay more for gasoline than they would have absent Defendants' conduct. This is supported by studies revealing how changes in the wholesale price of gasoline are passed through and incorporated into retail prices. Moreover, as industry analysts note, such increases in wholesale prices are passed through more quickly than any decrease.[4]

31.     When an unexpected supply disruption occurs, such as the one at the Torrance facility, this can cause a severe supply shortage in California due to California's strict vehicle emissions standards, as more fully explained herein. When such supply disruptions occur, market participants typically must obtain gasoline for California from foreign sources, usually Asia, which can take several weeks to make its way to California.

32.     SK Energy employee David Niemann ("Niemann") was the senior trader responsible for executing trades on the U.S. West Coast, including California. Another

---

[3] The unlawful conduct alleged herein was facilitated by other practices and cooperation between the Defendants through their executives. For example, beginning around October 2014 or early November 2014, Defendants established an earlier agreement to coordinate or cooperate regarding trading activities on the West Coast, including California. Information discloses that violations of the antitrust laws may have pre-dated the Class Period as alleged herein.

[4] Kendra Seymour, "California Gasoline Retail Margin Quick to Rise, Slow to Drop," www.stillwaterassociates.com, (Accessed May 9, 2020), https://stillwaterassociates.com/gasoline-retail-margin-quick-to-rise-slow-to-drop/?cn-reloaded=1.

CLASS ACTION COMPLAINT

SK Energy employee, Shelly Mohammed ("Mohammed"), held the role of gasoline scheduler and was Niemann's subordinate.[5]

33.    Vitol employee Brad Lucas ("Lucas") held the title "USWC Trader." Lucas was the primary trader at Vitol with responsibility for trading gasoline and gasoline blending components that were delivered via pipeline within California. Lucas reported to John Addison ("Addison"), a Vitol executive who in turn reported to the President of Vitol Americas. In addition to supervising Lucas, Addison also had trading responsibility that included trading gasoline and gasoline blending components that were primarily delivered via marine vessels to locations in the U.S. West Coast, including California.

34.    The initial coordination alleged herein began shortly after SK hired Niemann in August 2014, who immediately began trading gasoline contracts on the California spot market. Before working for SK, Nieman had held a similar role at Vitol for approximately ten years, where he and Lucas overlapped for a period of time. After leaving Vitol, Nieman maintained connections with his former colleagues, including Lucas, with whom he instant messaged, emailed, and spoke to on the phone. The two also had in-person meetings and met for dinner and drinks.

35.    By February 2015, Niemann was the senior trader for SK with responsibility for California trading, while Lucas held a similar role with Vitol. Although the extent of their coordination prior to that point is currently unknown, in February 2015 Lucas and Niemann expanded their existing coordination agreement to encompass Premium CARBOB.

36.    Additionally, Defendants' scheme to fix and manipulate the California spot market price was facilitated by the aforementioned explosion at the Torrance Refinery.

---

[5] SK Energy functioned as the California trading arm of SK Trading. While Niemann and Mohammed were nominally employees of Defendant SK Energy, SK's U.S. West Coast Trading Operation was conducted within the continuous and pervasive control and supervision of SK Trading and its subsidiaries, and SK Trading also specifically reviewed and approved key decisions to coordinate trading activities with Vitol.

37.     This explosion occurred in the facility's unit responsible for fluid catalytic cracking ("FCC"), a key part of a refinery complex that produces gasoline and related high-value products like alkylate. For the Torrance facility, the FCC unit was particularly important because it produced a significant portion of all the high-octane alkylate produced in California, which is a key ingredient in blending Premium CARBOB produced in California.

38.     Following the blast, the Torrance Refinery immediately shut down the FCC unit and reduced production of gasoline products, including alkylate, as repair efforts and a federal investigation into the explosion commenced. As a result of this unplanned outage, ExxonMobil needed to replace a significant amount of lost gasoline and alkylate production in Southern California to fulfill its supply needs.

39.     This explosion would have long term effects on the facility's production, as it caused the refinery to be run at limited capacity for over a year.

40.     Following this, Vital and SK reached agreements with each other and with third parties as part of a scheme to raise, fix, and tamper with the price of finished gasoline in California by using various tactics.

41.     An essential aspect of the scheme was to manipulate the OPIS-reported price during pricing windows for large contracts. The object of this was to drive up or stabilize the OPIS-reported price, thus allowing Defendants to realize supra-competitive profits while limiting bona fide market risk.

42.     While the Defendants employed varied and complex tactics to carry out their scheme, there were two key components: (1) engaging in trades to inflate the OPIS-published price in the Spot Market Report and (2) execute "facilitating trades" to obfuscate the nature of the scheme, to limit or eliminate bona fide market risk on the reported trades, and to share profits with one another other.

43.     Through this first strategy, Defendants manipulated trades to inflate the OPIS-reported price during the pricing windows for large contracts. To do so, defendants would selectively report certain transactions and engage in loss-leader

transactions reported to OPIS. This had the effect of driving up, stabilizing, or arresting the decline of the OPIS reported price. At times, this was facilitated through direct trades between the Defendants, while at others they used intermediary brokers.

44.    Many of the Defendants' loss-leader transactions were "leveraged" because they took losses on the purchase of smaller quantities of gasoline in order to increase the profits on sales of larger quantities of gasoline or alkylate. While the individual market-moving transactions were often uneconomic, or against their own self-interest, Defendants were able to realize a price increase on the larger floating price contracts and thus made up for any losses associated with loss-leader transactions.

45.    One manner in which Defendants accomplished this when trading Regular CARBOB was to transact the "high deal of the day" when that deal was reported to OPIS. This had the effect of bidding up the OPIS-reported price, as OPIS would report purchases at increasingly higher prices. Sometimes, this deal was the highest deal of the day, while other times, subsequent deals pushed the price even higher.

46.    By transacting the high deals, Defendants moved up the average of the OPIS Spot Market Report and created the impression that there was strong demand. This also had the effect of making it seem as though there was demand at higher than prevailing market prices.

47.    Another tactic used with Regular CARBOB would be done when transacting the "first deal." Defendants transacted this deal at an inflated price during key pricing windows, which involved completing an initial transaction during the early trading hours. OPIS would then report an inflated purchase price to other market participants. This would signal artificially high demand, thereby discouraging would-be sellers from submitting offers to sell below that price.

48.    Defendants would also engage in market-spiking trades for Premium CARBOB. As further discussed herein, there is significantly less trading of Premium

CLASS ACTION COMPLAINT

CARBOB. Therefore, individual Premium trades reported to OPIS can dramatically impact the spot market price.

49.     Defendants engaged in this practice to increase the OPIS-reported price for Premium during pricing windows for large sales of alkylate. While alkylate is a key blending component for Premium CARBOB, alkylate is not a separately reported commodity on California's spot markets. Consequently, large price contracts for alkylate were most commonly tied, with a small differential, to the OPIS-reported spot price for Premium CARBOB during the associated pricing window.

50.     Defendants' manipulation of spot prices for Regular gasoline also affected alkylate contract prices because spot prices for Regular and Premium gasoline often move in tandem.

51.     Therefore, to realize supra-competitive profits on alkylate contracts, Defendants worked together to inflate the spot price of Regular and Premium CARBOB during key pricing windows, and then coordinated their importation of alkylate into California at these supra-competitive prices.

52.     The second component of Defendants scheme involved the execution of "facilitating trades" related to the OPIS-reported transactions referenced above.

53.     These facilitating trades were used to, among other things, obfuscate the nature of the scheme, limit or eliminate bona fide market risk on the reported trades, and to share profits. These trades could be executed at the same time, before, or after the OPIS-reported trades and were executed between the Defendants and with third parties.

54.     For example, prior to a pricing window, Defendants took preplanned "short" positions, ensuring that they would need to buy during the pricing window. Then, when Defendants went on buying sprees that pushed up the OPIS-reported prices during the pricing windows, it would appear to other participants that there was an increase in demand. In fact, this demand was preplanned and artificial.

//

55.     These facilitating trades were often not reported to OPIS, and therefore hid the manipulative nature of the reported trade from OPIS and the wider market. The second trade ensured that no gasoline would actually change hands as a result of the OPIS-reported trade that inflated the price reported in the Spot Market Report.

56.     By moving in the opposite direction of the reported trade, the facilitating transaction ensured that there was little or no market risk associated with the reported transaction. Many of the facilitating trades – sometimes called "accommodation" or "prearranged" trades – appear to have been preplanned. The facilitating trade often had the effect of locking in a loss but also limiting the total exposure that Defendants faced as result of the reported transactions.

57.     Another facilitating tactic was to engage in unreported trades as a means of sharing profits from the scheme. In this way, Defendants entered into prearranged buy and sell contracts with each other as a means of transferring money rather than actual gasoline. These contracts often deviated from the prevailing market price and, therefore, were uneconomic.

58.     SK specifically approved and ratified decisions to agree and coordinate conduct and trading activities with Vitol. Defendants Vitol and SK also entered into agreements to share profits and took steps to conceal this other market participants.

59.     Defendants called their illegal agreements "joint ventures" or "JVs," however they were nothing more than secret agreements between the Defendants to facilitate their scheme. These agreements often started out as verbal agreements only, but were later referenced in various writings. During the Class period, Defendants' illegal conduct generated millions of dollars of profits for them per month, and Lucas and Niemann also financially benefitted as a result of their conduct.

60.     At some point in mid- to late-2015, the Defendants expanded their so-called JVs to include alkylate cargoes. Under this arrangement, one of the Defendants would import a cargo, but the two would work together to boost the profits from the sale.

61.    The agreement to share the profits of the alkylate cargoes was a crucial component of the scheme. As discussed above, Defendants engaged in market-spiking trades during the pricing windows for large sales of alkylate. Therefore, when Defendants shared the profits from the alkylate cargoes, it aligned their incentives to inflate the OPIS-reported prices during the pricing window for that alkylate.

62.    While the so-called JV agreements were being reached, Defendants engaged in the trading manipulation described above to benefit their common interest. Therefore, while it may have appeared to market participants the Defendants were competitors, the two companies were in fact working together.

63.    Furthermore, the agreements to coordinate Regular and Premium CARBOB trading and to share the profits of alkylate cargoes also reduced and eliminated competition between the Defendants for those products. As part of this coordination, Defendants entered into a large number of preplanned trades that diverged from prevailing market prices.

64.    Defendants' unlawful conduct allowed them to artificially move and inflate the price of Regular and Premium CARBOB. As a result, they reaped extraordinary and supra-competitive profits, as California trading generated millions of dollars of profits per month. However, this gain came at the expense of gasoline consumers.

65.    While the precise end date of the scheme is not yet known, the illicit conduct continued into 2016. The scheme likely terminated at or around the time that Niemann left SK in late 2016.

**B.    The Gasoline Supply Chain**

66.    In order to understand Defendants' scheme, it is important to understand the supply chain and how higher prices were ultimately passed through and paid by businesses and consumers at the pump. The average consumer obtains gasoline via a supply chain that begins with the extraction of crude oil and ultimately reaches a retail gas station. However, a number of intermediary steps occur in the process.

CLASS ACTION COMPLAINT

67.    Once crude oil has been extracted, it is transported to a refinery primarily by means of pipelines, marine tankers, and barges. At the refinery, crude oil is processed into gasoline and other petroleum products, with refined gasoline then transported to storage terminals for wholesale distribution. Like crude oil, refined gasoline is also transported via pipelines, marine tankers, and barges.

68.    From this point, refined gasoline is then shipped by truck to retail gas stations, where it ultimately reaches the consumer.  This process is illustrated by the figure produced by the Governmental Accountability Office ("GAO") below:[6]



Figure 2: Gasoline Production and Distribution System

Source: GAO.

C.    **The California Gasoline Market**

69.    The gasoline market for California is described as a "fuel island" when compared to other locations in the United States. This is due to the relatively few ways in which gasoline can physically enter the region. Thus, when California refineries experience production or maintenance issues, it can have a major impact on gasoline prices. For example, in April 2019, Los Angeles County reported a spike in gasoline

---

[6] United States Government Accountability Office, "Understanding the Factors That Influence the Retail Price of Gasoline," www.GAO.gov, p. 2, (Accessed May 8, 2020), https://www.gao.gov/new.items/d05525sp.pdf.

prices overnight, with responsibility being attributed to a combination of recent refinery issues and a lack of gasoline imports.[7] Moreover, local news outlets reported that Los Angeles was particularly hard hit because four out of the major ten refineries in California were located in Southern California.[8]

70.    Although California does utilize gasoline pipelines, there are none that ship finished gasoline products into California. Instead, the pipelines connecting California and other adjacent states only ship gasoline products out of California. As a result, additional gasoline and gasoline blending components must be brought into California via other channels when local supplies are insufficient to meet California's demand.

71.    Importantly, California also has stricter vehicle emissions standards than other states. Gasoline produced pursuant to these standards is called California Reformulated Gasoline Blendstock for Oxygenate Blending ("CARBOB").

72.    The CARBOB specifications are unique to California. Thus, gasoline used in neighboring states does not meet CARBOB specification and cannot be used as a substitute source of supply. Most of the CARBOB consumed in California is produced by refineries located in clusters near metropolitan centers in the San Francisco Bay Area and in the greater Los Angeles area.

73.    One such facility is located in Southern California in Torrance, California (the "Torrance Refinery"), which was owned by ExxonMobil Corp. ("ExxonMobil") at the time Defendants' alleged unlawful activity began in 2015. This refinery produces approximately twenty percent of all the gasoline sold in Southern California (and ten percent of the statewide supply). The Torrance Refinery also has the capacity to produce significant quantities of alkylate, a high-quality gasoline blending

---

[7] Tracy Bloom and Lynette Romero, "L.A. Gas Prices Hit Average of $4 Per Gallon After Rising 24 Cents in 1 Week: AAA," www.ktla.com, (Accessed May 9, 2020), https://ktla.com/news/local-news/l-a-gas-prices-hit-average-of-4-per-gallon-after-rising-24-cents-in-1-week-aaa/.
[8] *Id.*

component that can be combined with other blendstocks to create the two common grades of CARBOB: Regular CARBOB ("Regular") and Premium CARBOB ("Premium").

74.    These two grades of CARBOB are the most commonly consumed by California motorists in addition to being the most commonly traded on the spot market. Of the two, Regular is traded with far more frequency than Premium, although premium trades at a higher price.

### D.    The California Spot Market For Gasoline

75.    Participants in the gasoline market buy and sell the product for physical delivery within a short time frame in what is known as the "spot market." Spot markets are referred to as "physical" markets because market participants use them to obtain supplies of the actual product, with the parties negotiating for the fuel "on the spot." As a result, physical markets are located at or near refinery hubs and typically involve a minimum of 5,000 barrels (210,000 gallons) up to 50,000 barrels (2.1 million gallons).[9]

76.    There are various spot markets where gasoline and other fuels are traded throughout the United States, however the two most relevant in this litigation are in California: one in Los Angeles that serves Southern California and the other in San Francisco that serves Northern California. The other major spot markets in the United States are depicted in the image below:[10]

---

[9] Scott Berhang, "Pricing 101 Part 3: Wholesale Rack Fuel Pricing Essentials," www.blog.opisnet.com, (Accessed May 9, 2020), http://blog.opisnet.com/wholesale-rack-fuel-pricing-essentials.
[10] Scott Berhang, "Pricing 101 Part 2: Spot Fuel Markets Made Simple," www.blog.opisnet.com, (Accessed May 9, 2020), http://blog.opisnet.com/spot-fuel-markets-made-simple.

CLASS ACTION COMPLAINT

77.    The prices on the two California spot markets are influenced by gasoline prices on the New York Mercantile Exchange ("NYMEX"). These NYMEX prices are determined in a centralized market: there are typically thousands of gasoline trades on the NYMEX amounting to billions of gallons on every trading day. In addition, each transaction on the NYMEX is publicly reported, thereby making the price transparent to market participants.

78.    NYMEX is an exchange platform on which buyers and sellers can trade fuel commodities any time from a month to eighteen months in the future. This market is often called a "paper" market because physical barrels rarely pass between buyers and sellers. Instead, parties buy and sell contracts for fuel for a period in the future.[11]

79.    Prices on the California spot markets are generally influenced by the NYMEX price, as well as by regional and local supply and demand conditions, as depicted in the image below.[12] For many transactions on the California spot market,

---

[11] Scott Berhang, "Pricing 101 Part 1: Your Basic Guide to Pricing Gasoline and Diesel," www.blog.opisnet.com, (Accessed May 9, 2020), http://blog.opisnet.com/spot-fuel-markets-made-simple http://blog.opisnet.com/pricing-101-your-basic-guide-to-pricing-gasoline-and-diesel.
[12] Berhang, "Pricing 101 Part 2: Spot Fuel Markets Made Simple," *supra*.

the price for a refined gasoline is not transacted as a "flat price" (i.e. $2.00/gallon). Instead, such transactions are conducted in relationship to the commodity price on the NYMEX. This relationship is called a "differential" to the "cost basis." Thus, the spot price is measured by adding together the NYMEX price and the differential of the cost basis.



80.    Large quantities of gasoline are traded on the California spot market. Generally, spot market deals in California range between 420,000 gallons (10,000 barrels) to 2.1 million gallons (50,000 barrels). As noted, Regular CARBOB is traded with far more frequency than Premium CARBOB, although Premium trades at a higher price.

81.    Additionally, "Rack" or "Wholesale" purchases can be made along the fuel distribution system, often occurring at pipeline terminals. Unlike spot transactions, the quantity of such transactions are conducted in the amount of fuel in a typical fuel truck, which is in approximately 8,000 gallon increments.[13] Companies that re-sell fuel, as well as retailers or end users (e.g., trucking companies), pull fuel from the wholesale racks.

82.    The spot market price translates to the "rack" market prices, which are the wholesale prices that are paid when a gasoline tanker truck is filled up. Inflated

_____

[13] Berhang, "Pricing 101 Part 3: Wholesale Rack Fuel Pricing Essentials," *supra*.

rack market prices then directly translate into inflated prices in the retail market and ultimately what is paid at the pump.

### E. Spot Market Price Reporting In California

83.    In contrast to the NYMEX, California spot market trades are made through non-public transactions, sometimes called over-the-counter ("OTC") trades. Unlike the NYMEX, these transactions are not on a centralized, open exchange and thus California spot market prices are not immediately made public.

84.    Consequently, market participants are forced to rely on price-reporting services that report spot market prices from sources that participate in the market, such as traders, refiners, and brokers.

85.    The most widely used reporting service in California is the Oil Price Information Service, LLC ("OPIS"). The OPIS is a subscription service that publishes a daily OPIS West Coast Spot Market Report (the "Spot Market Report"), which is the industry pricing benchmark used by both buyers and sellers in California. Subscribers to OPIS get the Spot Market Report and can also receive market updates from OPIS throughout the day that include reported deals and other industry news.

86.    Price reporting by OPIS plays a crucial role in gasoline contracts which use a "floating price" that is determined at a future date as indicated in the contract. The parties agree on a differential above or below the spot price or prices published by OPIS. These floating price contracts can be tied to the future price of Regular or Premium as reported by OPIS in the Spot Market Report.

87.    The future dates on which the floating price in the contract is set are often referred to as "pricing windows." The pricing window can be an agreed-upon date or a date range. Pricing windows can also be tied to the dates of delivery or other conditions as indicated in the contract.

88.    Market participants voluntarily submit information on their trades to OPIS. OPIS calculates a daily spot price by, among other things, aggregating the trades that are reported to OPIS by market participants on a voluntary basis.

Therefore, the reporting of trades is a critical component of how OPIS calculates the daily spot prices.

89.    The Spot Market Report includes, among other gasoline products, the prices for Regular and Premium gasoline contracts for prompt (i.e., near term) delivery in Southern California and in Northern California. The Spot Market Report also contains forward prices for Regular and Premium delivery in upcoming future months.

90.    On a daily basis, there are usually many more Regular trades than Premium trades listed· in the Spot Market Report. Because trading in Premium is less common than Regular, a single Premium trade reported to OPIS tends to have a bigger impact on the spot market price than a single trade of Regular.

**F.    The Structure and Characteristics of the Gasoline and Gasoline Blending Components Market Render the Conspiracy More Plausible**

91.    The gasoline and gasoline blending components market in California is conducive to a price-fixing agreement because of its structure and other characteristics, which have made collusion particularly attractive in this market. Specifically, the gasoline and gasoline blending components market: (1) has high barriers to entry and (2) has inelasticity of demand.

**1.    The Gasoline and Gasoline Blending Components Market Has High Barriers to Entry.**

92.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

93.    There are substantial barriers that preclude, reduce, or make more difficult entry into the gasoline and gasoline blending components market. A new entrant into the business would face costly and lengthy start-up costs, including multi-

million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and long-standing customer relationships.

### 2. There is Inelasticity of Demand for Gasoline and Gasoline Blending Components.

94. "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

95. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

96. Demand for gasoline and gasoline blending components market is highly inelastic because there are no close substitutes for these products. In addition, customers must purchase gasoline to drive their gasoline-powered vehicles, even if the prices are kept at a supra-competitive level.

### G. Defendants Participated In The California Gasoline Spot Market

97. During the relevant time period, Defendants imported gasoline and gasoline blending components (e.g., alkylate) in California. Accordingly, they would have been active participants in the California gasoline Spot Market.

98. Defendant Vitol bought and sold spot market contracts for various types of fuel products, including Regular and Premium, and imported gasoline and gasoline blending components, such as alkylate, into California.

99.    Vitol employee Brad Lucas ("Lucas") held the title "USWC Trader." Lucas was the primary trader at Vitol with responsibility for trading gasoline and gasoline blending components that were delivered via pipeline within California. Lucas reported to John Addison ("Addison"), a Vitol executive who in turn reported to the President of Vitol Americas. In addition to supervising Lucas, Addison also had trading responsibility that included trading gasoline and gasoline blending components that were primarily delivered via marine vessels to locations in the U.S. West Coast, including California.

100.    Similarly, Defendant SK was an active participant in trading gasoline in California, during the relevant period.

101.    SK Energy bought and sold spot market contracts for various types of fuel products, including Regular and Premium, and imported gasoline and gasoline blending components, such as alkylate, into California.

102.    The effect of Defendants' collusive market manipulation is further evidenced by the following chart created by Severin Borenstein, chair of the PMAC—a group formed to investigate gasoline pricing in California between late 2014 and the end of 2016. Illustrating the unprecedented spikes in California's gasoline prices compared to the rest of the United States, this graphic demonstrates how the Defendants' illegal conduct, as described more fully herein, had an immediate and dramatic effect on California's gasoline prices.[14]

---

[14] Severin Borenstein, "California's Mystery Gasoline Surcharge Continues," www.energyathaas.wordpress.com, (Accessed May 9, 2020), https://energyathaas.wordpress.com/2018/02/26/californias-mystery-gasoline-surcharge-continues/.

CLASS ACTION COMPLAINT

California's Mystery Gasoline Surcharge - Jan 2000 to Jan 2018
(unexplained price premium versus US in real 2017 dollars per gallon)

Torrance Refinery Fire Feb. 18, 2015

## H.    California Laws Regulating Spot Market Trading

103.    Spot market trading of gasoline must comply with California's commodities fraud statute. *See* Cal. Corp. Code § 29504. Under this statute it is unlawful to engage in certain fraudulent acts when buying or selling commodity contracts. See Corp. Code § 29536, subds. (a), (b), (c), (d).

104.    Under section 29536(c) it is unlawful to "[t]o willfully engage in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon any persons." *See* Corp. Code § 29536(c).

105.    In addition, the federal Commodity Exchange Act ("CEA") makes unlawful certain types of "[p]rohibited transactions." *See* 7 U.S.C. § 6c. More specifically, the CEA prohibits any transaction that "is, of the character of, or commonly known to the trade as, a 'wash sale' or 'accommodation trade.'" *See* 7 U.S.C. § 6c(a)(2)(A)(i).

106.    The CEA also prohibits a transaction that "is used to cause any price to be replied, registered, or recorded that is not a true and bona fide price." *See* 7 U.S.C. § 6c(a)(2)(B).

## I.     The Effect of Higher Gasoline Prices on Consumers

107.   As a consequence of Defendants' conduct, California businesses and consumers paid higher gasoline prices.

108.   In 2018, Californians paid an average of 30 cents more per gallon of gasoline than average citizen of other states at retailers like 76, Chevron, and Shell. This equates to an extra $4.50 to fill up a 15-gallon gasoline tank.[15]

109.   Despite name-brand gasoline retailers claiming to sell higher-quality gasoline than lower-priced retailers, the high standards for gasoline in California means there is no actual difference between the two.

110.   To account for this difference in price, Governor Gavin Newsom asked the California Energy Commission ("CEC") for an in-depth analysis of potential causes. In its April 2019 initial report, the CEC determined there was a $1.00 differential between national and California gas prices.[16] After accounting for a number of readily explainable factors, the CEC found an unexplained residual increase in gas prices in California over the last five years.[17]

111.    The CEC went back to further examine potential causes for this residual, delivering its "Additional Analysis on Gasoline Prices in California" on October 21, 2019. The CEC estimated that California gasoline consumers paid an additional $1.5 billion in 2018 and $11.6 billion over the last five years.[18]

112.   Despite declining to opine on whether California's high gas prices resulted from unlawful conduct in the industry, the CEC noted that additional investigation was necessary to determine if such behavior occurred.[19] In an impressive display of prescience, the CEC identified the California Department of Justice as the

---

[15] California Energy Commission, "Additional Analysis on Gasoline Prices in California," www.energy.ca.gov, p. 1, (Accessed May 9, 2020), https://www.energy.ca.gov/sites/default/files/2019-10/Gas_Price_Report_0.pdf.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.* at 10.

agency "well equipped" to handle any such investigation–a sentiment with which California lawmakers ultimately agreed.

### J.    Government Investigations

113.    Over at least the past year, the California gasoline industry has been the subject of investigation, beginning with Governor Gavin Newsom's April 22, 2019 request to the California Energy Commission (CEC) for an in-depth analysis of the causes of the increased differential between national and California gasoline prices.[20]

114.    On May 4, 2020, Attorney General Becerra announced the filing of a lawsuit against the Defendants for alleged manipulation of California's gas prices resulting in artificially inflated retail gasoline prices.[21]

115.    Asserting allegations substantially similar to those in this action, the Attorney General claims the Defendants took advantage of market disruption caused by the February 2015 explosion at the Torrance Refinery and violated California's antitrust laws and engaged in unlawful, unfair, and fraudulent practices that raised the price of gasoline in the state.

116.    In particular, the lawsuit accuses the Defendants of engaging in manipulative trades to increase profits by selectively reporting trades to the OPIS in order to drive up the benchmark prices of Regular and Premium gasoline in OPIS's Spot Market Report.

117.    The Attorney General further alleged the Defendants engaged in market-spiking trades to drive up the prices of large trades, while executing other trades to hide their scheme and share profits.

---

[20] *Id.* at 1.
[21] Press Release, "Attorney General Becerra Announces Lawsuit Against Two Multinational Companies for Manipulating Gas Market, Costing Californians More at the Pump," www.oag.gov.gov (Accessed May 9, 2020), https://oag.ca.gov/news/press-releases/attorney-general-becerra-announces-lawsuit-against-two-multinational-companies.

118.   In short, the investigations led the state of California to conclude there was sufficient evidence to pursue action against Defendants for engaging in the same unlawful conduct alleged herein.

## VI.   CLASS ALLEGATIONS

119.   Plaintiff brings this action both on behalf of himself and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of the following class:

> All persons or entities that purchased gasoline from a retailer within the State of California from at least as early as February 18, 2015 through December 31, 2016 ("Class Period").

120.   This definition specifically excludes the following persons or entities: (a) any of the Defendants named herein; (b) any of the Defendants' parent companies, subsidiaries, and affiliates; (c) any of the Defendants' officers, directors, management, employees, subsidiaries, affiliates or agents; (d) all governmental entities; and (e) the judges and chambers staff in this case, as well as any members of their immediate families. Plaintiff reserves the right to expand, modify, or alter the class definition in response to information learned during discovery.

121.   This action is properly brought as a class action under Federal Rule of Civil Procedure 23(a) for the following reasons:

(a) **Numerosity (Fed. R. Civ. P. 23(a)(1)):** The proposed Class is so numerous and geographically dispersed throughout California that the joinder of all Class Members is impracticable. While Plaintiff does not know the exact number and identity of all Class Members, Plaintiff is informed and believe that there are millions of Class Members. The precise number of Class Members can be ascertained through discovery;

(b) **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) and 23(b)(3)):** There are questions of law and fact common to the

proposed class which predominate over any questions that may affect particular Class Members. Such common questions of law and fact include, but are not limited to:

    i.  Whether Defendants contracted, combined, or conspired with one another to restrain trade in the spot market for gasoline at any time during the Class Period;

    ii.  The identity of the participants of the alleged conspiracy;

    iii.  The duration of the alleged conspiracy and the acts carried out by the Defendants and their co-conspirators in furtherance of the conspiracy;

    iv.  Whether Defendants' conduct caused the prices of gasoline sold at retail to be higher than the competitive level as a result of their restraint of trade;

    v.  Whether Plaintiff and the other members of the Class were injured by Defendants' conduct and, if so, the determination of the appropriate Class- wide measure of damages;

    vi.  Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief;

    vii.  Whether the alleged conspiracy violated the Sherman Act;

    viii.  Whether the alleged conspiracy violated California's antitrust and unfair competition laws;

    ix.  Whether Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Class, thereby entitling Plaintiff and the members of the Class to disgorgement of all benefits derived by Defendants;

//

//

x.   Whether Plaintiff and members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy; and

xi.   Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiff and the members of the Class.

(c) **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of the claims of the members of the proposed Class. Plaintiff and the Class have been injured by the same wrongful practices of Defendants. Plaintiff's claims arise from the same practices and conduct that give rise to the claims of the Class and are based on the same legal theories;

(d) **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)):** Plaintiff will fairly and adequately protect the interests of the Class in that they have no interests antagonistic to those of the other members of the Class, and Plaintiff has retained attorneys experienced in antitrust class actions and complex litigation as counsel;

122.   This action is properly brought as a class action under Federal Rule of Civil Procedure 23(b) for the following reasons:

(a) **Declaratory and Injunctive Relief (Fed. R. C. P. 23(b)(2)):** Certification under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

(b) **Superiority and Predominance (Fed. R. Civ. P. 23(b)(3)):** Certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action

treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

(c) The proposed Class is ascertainable and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each proposed Class Member were infringed or violated in the same fashion;

123. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a) Given the size of individual Class Member's claims and the expense of litigating those claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendants committed against them and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

(b) This action will promote an orderly and expeditious administration and adjudication of the proposed Class claims, economies of time, effort and resources will be fostered and uniformity of decisions will be insured;

(c) Without a class action, Class Members will suffer damages, and Defendant's violations of law will proceed without remedy while Defendants reaped and retained the substantial proceeds of their wrongful conduct; and

(d) Plaintiff knows of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

124. Plaintiff intends to provide notice to the proposed class by communicating the existence of the action in popular trade publications in the industry, utilizing online advertisements, and using professional notice companies to

strategically and comprehensively develop additional methods to reach class members.

## VII. TOLLING OF THE STATUTE OF LIMITATIONS

### A. Plaintiff's Delayed Discovery Tolled the Statute of Limitations

125. Plaintiff and class members had no knowledge of Defendants' combination or conspiracy, or of facts sufficient to place them on inquiry notice of the claims set forth herein until the California Attorney filed a complaint against Defendants on May 4, 2020.

126. Plaintiff and class members purchased refined gasoline at prices that were artificially inflated as a result of Defendants' unlawful agreement to manipulate the California refined gasoline market. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered the combination and conspiracy.

127. Throughout the class period, and until May 4, 2020, no information in the public domain was available to Plaintiff and class members that revealed sufficient information to suggest that any of the Defendants was involved in an unlawful scheme to raise, fix, maintain and stabilize retail prices for refined gasoline.

128. It was reasonable for Plaintiff and class members not to suspect that Defendants were engaging in any unlawful anticompetitive behavior.

129. Plaintiff allege a continuing course of unlawful conduct by and among Defendants, including conduct within the applicable limitations periods. That conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.

130. For these reasons, the statutes of limitations applicable to Plaintiff's and class members' claims have been tolled with respect to the claims asserted herein.

//

//

//

**B.    Defendants' Fraudulent Concealment Tolled the Statute of Limitations**

131.   Additionally or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitations on Plaintiff's claims. Plaintiff and class members had no knowledge of the combination or conspiracy alleged in this complaint, or of facts sufficient to place them on inquiry notice of their claims, until May 4, 2020 when the California Attorney filed a complaint against Defendants. No information in the public domain or otherwise available to Plaintiff and the class during the class period suggested that Defendants were involved in an unlawful scheme to artificially inflate and maintain refined gasoline prices in California.

132.   Defendants concealed their scheme by not disclosing that they were conspiring to manipulate California refined gasoline prices, and also through the obscure facilitating trading activity described herein. Defendants' scheme also was inherently self-concealing because, as Defendants knew, its disclosure would have led to governmental enforcement activity or civil liability. Refined gasoline is subject to antitrust and unfair competition law regulation, so it was reasonable for Plaintiff and class members to presume that California refined gasoline was being sold in a competitive market. A reasonable person under the circumstances would not have had occasion to suspect that refined gasoline was being sold at supra-competitive prices at any time during the class period.

133.   Because Defendants' scheme was self-concealing and affirmatively concealed by Defendants, Plaintiff and class members had no knowledge of the conspiracy or of any facts or information that would have caused a reasonably diligent person to suspect a conspiracy existed during the class period.

134.   Moreover, Defendants took steps to affirmatively conceal their illicit activities. In one such instance before the California Energy Commission, Vitol's Lucas knowingly misrepresented the reason for high gasoline prices following the Torrance Refinery explosion. In speaking to the PMAC, as well as Kathleen Foote,

Senior Assistant Attorney General and Chief of the Antitrust Division, Lucas deceptively blamed ExxonMobil's lack of transparency for high gasoline prices. However, Lucas knew full well that such prices stemmed from his participation in illegal manipulation of the spot market. He stated:

> So you know, last year we brought in quite a few cargos into L.A., both alkaloid (phonetic) and finish CARBOB that went through Kinder Morgan's system and sold direct to Exxon and some other refiners. You know, one of the big things that this whole conversation has entailed is about the high prices. One of the reasons why, in my opinion, was the lack of transparency with what was going on with Torrance. Because if you remember when it first blew up back in February, there was like an eternal rolling one-month period where they were going to get back up and running. And they kept saying next month, next month, next month. So the trading companies in general, it takes four to five weeks to ship a cargo out, if Exxon is coming back up they're not going to ship into closed ARB. So because there was no real timeline of when Exxon was going to come back up and running, we would generally not—you don't put cargos on the water and ship them to the West Coast just on a punt, basically, hoping that you can sell them when they get there. That's what happened with that one cargo that was done by another trading company who sent it out there, at which point in time the market had collapsed, and so he was unable to sell it, and so he sailed it away again. So that's what happened with that one. So if there was more transparency with what was going on with refinery maintenance, when it was going to come back up, it would have allowed us to see if it was more—if we were going to be able to land these cargos and actually into a competitive market. If Exxon is back up and running the market is going to fall dramatically. So basically kind of that lack of information kept cargos at bay. There were still a lot shipped into the West Coast, but not as many as could have been or would have been done. If we had actually known

1
2

that Exxon was going to be down for over a year there would have been a much
bigger import play over that time frame.[22]

3
4
5
6

135.    Moreover Defendants repeatedly misled OPIS about the true nature of
their trading activities by reporting artificially high spot trades directly or indirectly
between them, but concealing the existence of offsetting wash trades that reduced or
effectively limited any market risk in the primary trade.

7
8
9

136.    Therefore, by operation of Defendants' fraudulent concealment, the
statutes of limitations applicable to Plaintiff's and class members' claims were tolled
throughout the class period.

10

## VIII.  CLAIMS FOR RELIEF

11
12

### COUNT ONE
### Violation of the Sherman Act
### (15 U.S.C. § 1—Injunctive Relief Only)
### (Against all Defendants)

13
14

137.    Plaintiff hereby repeats and incorporates by reference each preceding
paragraphs as though fully set forth herein.

15
16
17
18

138.    Defendants entered into and engaged in a continuing combination,
conspiracy or agreement to unreasonably restrain trade or commerce in violation of
Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially restraining competition
with respect to the price of gasoline within the State of California.

19
20

139.    Defendants' activities constitute a per se violation of Sections 1 of the
Sherman Act.

21
22
23
24
25

140.    Defendants' anticompetitive and unlawful conduct has proximately
caused injury to Plaintiff and members of the Class by restraining competition and
thereby raising, maintaining and/or stabilizing the price of gasoline at levels above
what would have occurred if competition had prevailed. For this conduct, Plaintiff and
members of the Class are entitled to injunctive relief pursuant to 15 U.S.C. § 26.

26
27
28

---

[22] *See* https://www.energy.ca.gov/data-reports/planning-and-forecasting/petroleum-
market- advisory-committee, August 16, 2016 Meeting Transcript at pp. 129:24-131:10

## COUNT TWO
### Violation of the Cartwright Act
**(California Business and Professions Code section 16720 *et seq*.)**
**(Against all Defendants)**

141.   Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

142.   Defendants entered into and engaged in a continuing combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of California Business and Professions Code § 16720 et seq. by artificially restraining competition with respect to the price of gasoline within the State of California.

143.   Defendants' activities constitute a per se violation of the Cartwright Act.

144.   Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and members of the Class by restraining competition and thereby raising, maintaining and/or stabilizing the price of gasoline at levels above what would have occurred if competition had prevailed. For this conduct, Plaintiff and members of the Class are entitled to treble damages and injunctive relief pursuant to California Business and Professions Code section 16750(a).

## COUNT THREE
### Violation of the Unfair Competition Law
**(California Business and Professions Code section 17200 *et seq*.)**
**(Against all Defendants)**

145.   Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

146.   Defendants committed acts of unfair competition, as described above, in violation of the UCL.

147.   Defendants' conduct constitutes an "unlawful" business practice within the meaning of the UCL, and includes, without limitation, the following:

(a) Violating the Sherman and Cartwright Acts, as set forth above;

(b) Engaging in wash sales and otherwise manipulating the benchmark prices reported on the California gasoline spot market in violation of

California Corporations Code §§ 29535, 29536, 29537, 29538 and the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*

148.   Defendants' conduct separately constitutes an "unfair" business practice within the meaning of the UCL because Defendants' practices have caused and are "likely to cause substantial injury" to the Plaintiff and the members of the Class that is not "reasonably avoidable" by them.

149.   Defendants' conduct, as alleged herein, is and was contrary to public policy, immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers. Any purported benefits arising out of Defendants' conduct do not outweigh the harms caused to the victims of Defendants' conduct.

150.   Defendants' conduct is also "unfair" because it is contrary to numerous legislatively-declared policies, as set forth in the Sherman Act, the Cartwright Act, the California Corporations Code and in the Commodities Exchange Act.   Here, Defendants' conduct not only violates the letter of the law, but it also contravenes the spirit and purpose of each of those statutes. The conduct threatens an incipient violation of each of those laws and has both an actual and a threatened impact on competition.

151.   Defendants' conduct, as described above, also constitutes an "fraudulent" business practice within the meaning of the UCL. Defendants' trading activity on the California gasoline spot market fraudulently raised the price of gasoline above the competitive level through fictitious "wash" trades and other manipulative conduct that did not shift economic risk for the transaction to an arm's length counterparty. This conduct was designed to deceive—and did deceive—other market participants about the true supply and demand situation for gasoline in order to artificially increase the price of gasoline in California.

152.   Plaintiff and the members of the Class have suffered injury in fact and have lost money as a result of Defendants' violations of the UCL in that they paid more for gasoline than they would have paid in a competitive market. They are

therefore entitled to restitution and injunctive relief pursuant to California Business and Professions Code §17203.

**COUNT FOUR**
**Unjust Enrichment**
**(Against All Defendants)**

153.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

154.    Plaintiff brings this claim under the laws of California.

155.    As a result of its unlawful conduct described above, Defendants have been unjustly enriched.

156.    Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of gasoline blending components.

157.    Defendants have benefited from its unlawful acts and it would be inequitable for them to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and the members of the Class.

158.    Plaintiff and the members of the Damages Class are entitled to the amount of the Defendants' ill-gotten gains resulting from its unlawful, unjust, and inequitable conduct. Plaintiff and the members of the Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the members of the Class may make claims on a pro rata basis.

159.    Pursuit of any remedies against the firms from which Plaintiff and the members of the Class purchased gasoline subject to Defendants' conspiracy would have been futile.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment on its behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

1.    That the Court determine that this action may be maintained as a class action under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), that Plaintiff be

certified as class representative, and Plaintiff's counsel be appointed as counsel for the class;

2.    That the unlawful contract, combination or conspiracy alleged be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

3.    Defendants have contracted, combined and conspired in violation of the Cartwright Act.

4.    Defendants have violated the UCL by engaging in conduct that constitutes unlawful, unfair and fraudulent business practices.

5.    Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations

6.    That Plaintiff and the class recover damages, as provided by law, determined to have been sustained as to each of them, in an amount to be trebled in accordance with the antitrust laws, and that judgment be entered against Defendants on behalf of Plaintiff and the class;

7.    That Plaintiff and the class recover their costs of suit, including reasonable attorneys' fees, costs, and expenses of the lawsuit, as provided by law;

8.    That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

9.    That Plaintiff and the class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action; and

10.    Plaintiff and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

//

      i.    A judicial determination declaring the rights of Plaintiff and the Class, and the corresponding responsibilities of Defendants; and

     ii.    Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the Respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from violations of the law as alleged herein.

11.    Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class;

12.    Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

13.    For such other and further relief as is just under the circumstances.

## X.  DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff and the class demand a trial by jury of all the claims asserted in this complaint that are so triable.

Dated:  July 17, 2020          Respectfully submitted,

                            GROSS & BELSKY P.C.


                            By: _/s/ Terry Gross_____
                                TERRY GROSS

                            Attorneys for Plaintiff
                            RITUAL COFFEE ROASTERS, INC.

CLASS ACTION COMPLAINT